No. 20-55634

IN THE

# United States Court of Appeals for the Ninth Circuit

FAOUR ABDALLAH FRAIHAT ET AL.,

*Plaintiffs-Appellees,*

*v.*

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ET AL.,

*Defendants-Appellants.*

(*Full caption on inside cover*)

On Appeal from the United States District Court for
the Central District of California
No. 5:19-cv-01546-JGB-SHK, Hon. Jesus G. Bernal

## BRIEF OF PLAINTIFFS-APPELLEES

Timothy P. Fox
Elizabeth Jordan
CIVIL RIGHTS EDUCATION AND
  ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
(303) 757-7901

Jared Davidson
SOUTHERN POVERTY LAW CENTER
201 St. Charles Avenue,
Suite 2000
New Orleans, LA 70170
(504) 486-8982

Stuart Seaborn
Melissa Riess
Rosa Lee Bichell
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, CA 94704
(510) 665-8644

William F. Alderman
Brian P. Goldman
Mark Mermelstein
Jake Routhier
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700

Matthew R. Shahabian
Melanie R. Hallums
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

Katherine M. Kopp
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Plaintiffs-Appellees (additional counsel on inside cover)*

FAOUR ABDALLAH FRAIHAT; MARCO MONTOYA AMAYA; RAUL ALCOCER CHAVEZ; JOSE SEGOVIA BENITEZ; HAMIDA ALI; MELVIN MURILLO HERNANDEZ; JIMMY SUDNEY; JOSE BACA HERNANDEZ; EDILBERTO GARCIA GUERRERO; MARTIN MUNOZ; LUIS MANUEL RODRIGUEZ DELGADILLO; RUBEN DARIO MENCIAS SOTO; ALEX HERNANDEZ; ARISTOTELES SANCHEZ MARTINEZ; SERGIO SALAZAR ARTAGA; INLAND COALITION FOR IMMIGRANT JUSTICE; AL OTRO LADO,

*Plaintiffs-Appellees,*

*v.*

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF; MATTHEW T. ALBENCE; DEREK N. BRENNER; TIMOTHY S. ROBBINS; TAE JOHNSON; STEWART D. SMITH; JACKI BECKER KLOPP; DAVID P. PEKOSKE,

*Defendants-Appellants.*

Maria del Pilar Gonzalez Morales
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
(805) 813-8896

Shalini Goel Agarwal
SOUTHERN POVERTY LAW CENTER
106 East College Avenue,
Suite 1010
Tallahassee, FL 32301
(850) 521-3024

Christina Brandt-Young
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
(212) 644-8644

Michael W. Johnson
Dania Bardavid
Jessica Blanton
Joseph Bretschneider
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

Leigh Coutoumanos
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
(202) 303-1000

Veronica Salama
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, GA 30031
(404) 221-5825

*Counsel for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees are individuals and two nonprofit entities (Inland Coalition for Immigrant Justice and Al Otro Lado) that have no parent corporation. No publicly held corporation owns ten percent or more of any stake or stock in those entities.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES.....................................................iv

INTRODUCTION ...........................................................1

JURISDICTIONAL STATEMENT ..............................................5

STATEMENT OF THE CASE ................................................5

    The COVID-19 Pandemic....................................................5

    COVID-19 Among Detained Populations.......................................6

    ICE's COVID-19 Response.................................................8

    Plaintiffs' August 2019 Lawsuit ............................................11

    The April 2020 Preliminary Injunction......................................11

    Ongoing Proceedings In The District Court.................................14

SUMMARY OF ARGUMENT .............................................15

STANDARD OF REVIEW...................................................18

ARGUMENT...............................................................19

    I.    The District Court Did Not Abuse Its Discretion In Granting A Narrowly Tailored Preliminary Injunction To Protect Plaintiffs From COVID-19.................................19

        A.    Plaintiffs are likely to succeed on the merits of their deliberate indifference claim.............................20

            1.    ICE does not dispute that Plaintiffs face a substantial risk of serious harm because of its decisions........................................22

            2.    Extensive evidence supports the district court's finding that ICE's COVID-19 response was objectively unreasonable. ............24

        B.    Plaintiffs are likely to succeed on the merits of their punitive conditions claim. .................38

C.     Plaintiffs are likely to succeed on the merits of their Rehabilitation Act claim. .................................. 44

D.     The other preliminary injunction factors strongly favor Plaintiffs. ........................................................ 51

      1.     Plaintiffs are likely to suffer grave harm. ......... 51

      2.     The balance of hardships and public interest "sharply incline" in Plaintiffs' favor..... 54

II.     The Court Should Reject ICE's Challenge To The Class Certification Order. ............................................ 56

A.     The Court lacks jurisdiction over the interlocutory class certification order. ........................ 56

B.     The district court did not abuse its discretion in provisionally certifying the subclasses. ...................... 61

      1.     Plaintiffs established commonality.................... 63

      2.     Plaintiffs demonstrated typicality. ................... 70

      3.     Plaintiffs are adequate class representatives. ............................................... 75

CONCLUSION ................................................................... 77

STATEMENT OF RELATED CASES ................................... 79

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ........................................................ 20

*Armstrong v. Brown,*
732 F.3d 955 (9th Cir. 2013) .............................................. 17, 47, 48

*Armstrong v. Davis,*
275 F.3d 849 (9th Cir. 2001) ....................................................67, 75

*Bates v. United Parcel Serv., Inc.,*
511 F.3d 974 (9th Cir. 2007) .......................................................... 58

*Bell v. Wolfish,*
441 U.S. 520 (1979) ................................................................. 38, 43

*Bresgal v. Brock,*
843 F.2d 1163 (9th Cir. 1987) ........................................................ 74

*Brown v. Plata,*
563 U.S. 493 (2011) ..........................................................21, 37, 38

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ........................................................................ 73

*Cunningham v. Gates,*
229 F.3d 1271 (9th Cir. 2000) ........................................................ 59

*Dep't of Homeland Sec. v. New York,*
140 S. Ct. 599 (2020) ..................................................................... 74

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
489 U.S. 189 (1989) ........................................................................ 20

*Doe v. Wolf,*
424 F. Supp. 3d 1028 (S.D. Cal. 2020) .......................................... 72

*Doe #1 v. Trump,*
  957 F.3d 1050 (9th Cir. 2020).........................................................60, 74

*E. Bay Sanctuary Covenant v. Trump,*
  932 F.3d 742 (9th Cir. 2018)...................................................................55

*Edmo v. Corizon, Inc.,*
  935 F.3d 757 (9th Cir. 2019)...................................................................34

*Elrod v. Burns,*
  427 U.S. 347 (1976).................................................................................51

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.,*
  630 F.3d 1153 (9th Cir. 2011).................................................................22

*Fraihat v. U.S. Immigration & Customs Enf't,*
  2020 WL 2758553 (C.D. Cal. May 15, 2020).........................................34

*FTC v. Affordable Media, LLC,*
  179 F.3d 1228 (9th Cir. 1999).................................................................19

*Gantt v. City of Los Angeles,*
  717 F.3d 702 (9th Cir. 2013)...................................................................24

*Gordon v. Cnty. of Orange,*
  888 F.3d 1118 (9th Cir. 2018).................................................16, 21, 24

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998).........................................................75, 76

*Helling v. McKinney,*
  509 U.S. 25 (1993)............................................................................29, 53

*Hernandez v. Cnty. of Monterey,*
  110 F. Supp. 3d 929 (N.D. Cal. 2015)....................................................47

*Hernandez v. Sessions,*
  872 F.3d 976 (9th Cir. 2017)...................................................................43

*Jennings v. Rodriguez,*
  138 S. Ct. 830 (2018)..............................................................................65

*Jones v. Blanas,*
393 F.3d 918 (9th Cir. 2004)........................................ 16, 38, 39, 43, 44

*Just Film, Inc. v. Buono,*
847 F.3d 1108 (9th Cir. 2017)........................................................ 71

*K.W. ex rel. D.W. v. Armstrong,*
789 F.3d 962 (9th Cir. 2015)............................................ 19, 28, 45, 50

*King v. Cnty. of Los Angeles,*
885 F.3d 548 (9th Cir. 2018)..................................................... 39, 42

*Kingsley v. Hendrickson,*
576 U.S. 389 (2015) ..................................................................... 24

*Mark H. v. Hamamoto,*
620 F.3d 1090 (9th Cir. 2010)................................................... 49, 50

*McGary v. City of Portland,*
386 F.3d 1259 (9th Cir. 2004).......................................................... 48

*Melendres v. Arpaio,*
695 F.3d 990 (9th Cir. 2012)..................................................... 5, 51

*Meredith v. Oregon,*
321 F.3d 807 (9th Cir. 2003)............................................................. 58

*Microsoft Corp. v. Baker,*
137 S. Ct. 1702 (2017)...................................................... 17, 57, 58, 59

*Miller v. Gammie,*
335 F.3d 889 (9th Cir. 2003)........................................................... 58

*Nutraceutical Corp. v. Lambert,*
139 S. Ct. 710 (2019) ................................................................... 57

*Olmstead v. L.C. ex rel. Zimring,*
527 U.S. 581 (1999) ................................................................... 48

*Orantes-Hernandez v. Holder,*
321 F. App'x 625 (9th Cir. 2009) .................................................. 54

*Padilla v. ICE,*
953 F.3d 1134 (9th Cir. 2020)..........................................17, 19, 52, 60

*Paige v. California,*
102 F.3d 1035 (9th Cir. 1996)..........................................................57

*Parsons v. Ryan,*
754 F.3d 657 (9th Cir. 2014).....................18, 62, 63, 68, 69, 70, 71, 72

*Pashby v. Delia,*
709 F.3d 307 (4th Cir. 2013)..................................................18, 60, 61

*Pitts v. Terrible Herbst, Inc.,*
653 F.3d 1081 (9th Cir. 2011)..........................................................72

*Ramirez v. TransUnion LLC,*
951 F.3d 1008 (9th Cir. 2020)..........................................................19

*Rodriguez v. Hayes,*
591 F.3d 1105 (9th Cir. 2010)..........................................62, 69, 70, 72

*Rodriguez v. Robbins,*
715 F.3d 1127 (9th Cir. 2013)..........................................................55

*S. Bay United Pentecostal Church v. Newsom,*
140 S. Ct. 1613 (2020).....................................................................6

*Saravia v. Sessions,*
905 F.3d 1137 (9th Cir. 2018)......................................................18, 19

*SEC v. Coldicutt,*
258 F.3d 939 (9th Cir. 2001)............................................................35

*Singh v. George Wash. Univ. Sch. of Med. & Health Scis.,*
667 F.3d 1 (D.C. Cir. 2011)..............................................................46

*Swain v. Junior,*
961 F.3d 1276 (11th Cir. 2020)........................................................24

*Torres v. Mercer Canyons Inc.,*
835 F.3d 1125 (9th Cir. 2016)..........................................................70

*Toyota Motor Mfg., Ky., Inc. v. Williams,*
534 U.S. 184 (2002) ................................................................ 46

*United States v. Dreyer,*
767 F.3d 826 (9th Cir. 2014) ................................................... 8

*Updike v. Multnomah Cnty.,*
870 F.3d 939 (9th Cir. 2017) ......................................... 44, 48

*Valentine v. Collier,*
956 F.3d 797 (5th Cir. 2020) .................................................. 24

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011) ........................................ 63, 64, 67, 70

*Wilson v. Seiter,*
501 U.S. 294 (1991) ................................................................ 36

*Wilson v. Williams,*
961 F.3d 829 (6th Cir. 2020) .................................................. 24

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ................................................................... 20

*Youngberg v. Romeo,*
457 U.S. 307 (1982) ................................................................ 28

*Zepeda v. INS,*
753 F.2d 719 (9th Cir. 1983) .................................................. 5

**Statutes**

ADA Amendments Act of 2008, Pub. L. No. 110-325, 122
Stat. 3553 .............................................................................. 46

Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat.
355 ................................................ 11, 12, 16, 17, 44, 48, 50

8 U.S.C. § 1226 ........................................................................ 6

28 U.S.C. § 1292 .................................................................... 56

28 U.S.C. § 1292(a)(1) ....................................................................... 5

28 U.S.C. § 1292(e) ..................................................................... 56, 58

28 U.S.C. § 1331 .............................................................................. 5

28 U.S.C. § 1343 .............................................................................. 5

28 U.S.C. § 1391(e)(1) .................................................................... 74

42 U.S.C. § 12102(1)(A) ................................................................. 46

**Rules and Regulations**

6 C.F.R. § 15.30(d) ......................................................................... 48

28 C.F.R. § 35.130(d) ..................................................................... 48

Fed. R. Civ. P. 23 ..................................................................... 12, 73

Fed. R. Civ. P. 23(a) ............................................................ 61, 74, 75

Fed. R. Civ. P. 23(a)(2) ................................................................. 63

Fed. R. Civ. P. 23(a)(3) .......................................................... 70, 72

Fed. R. Civ. P. 23(b)(2) .................................................... 13, 61, 62

Fed. R. Civ. P. 23(f) ........................................ 17, 56, 57, 58, 59, 60

Fed. R. Evid. 201(b)(2) .................................................................... 8

S. Ct. R. 10(a) ................................................................................ 74

**Other Authorities**

Samuel L. Bray, *Multiple Chancellors: Reforming the
National Injunction*, 131 Harv. L. Rev. 417 (2017) ........................... 62

CDC, *Cases, Data, and Surveillance*,
https://www.cdc.gov/coronavirus/2019-ncov/covid-
data/covidview/index.html ................................................................. 8

Michael T. Morley, *De Facto Class Actions?*, 39 Harv. J.L. & Pub. Pol'y 487 (2016)............................................................62

U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, *COVID-19 Pandemic Response Requirements version 2.0* (June 22, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19respon seReqsCleanFacilities-v2.pdf ...........................................................15

U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, *COVID-19 Pandemic Response Requirements version 3.0* (July 28, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19respon seReqsCleanFacilities.pdf.................................................................15

U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19: ICE Detainee Statistics*, https://www.ice.gov/coronavirus#tab2 (last updated August 14, 2020) .......................................................................8, 32

## INTRODUCTION

For months now, public health officials have been telling us all to wash our hands, stay six feet away from others, wear masks, and quarantine if we might be sick with COVID-19. But that has not been an option for the people who Immigration and Customs Enforcement (ICE) has detained in "close quarters" and without access to adequate precautions against COVID-19 infection. ER17, 22. And for the thousands of them who are at especially high risk of severe illness or death from COVID-19 because of their age, health conditions, or disabilities, ICE's listless response to the pandemic has left them as "sitting ducks." SER541. As many as 15% of those in detention with medical vulnerabilities will die if they catch the virus, and many more will suffer serious long-term injuries. ER33, 39.

Social distancing is, of course, "often impossible" in detention settings. ER8. But when distancing is less feasible, other complementary precautions like sanitizing, testing, and isolating become all the more important. The Centers for Disease Control and Prevention (CDC) thus urged "correctional and detention facilities" nationwide to take a mix of concrete actions to "reduce the risk of

1

transmission and severe disease from COVID-19." ER8-9; SER198. Neglecting both social distancing *and* those other measures is a recipe for disaster.

Yet, as the district court found, that is exactly what ICE did. ICE did not heed the CDC's expert advice, nor did it listen to the Department of Homeland Security's (DHS) own health advisers, who warned early on of an emerging "tinderbox scenario" that posed an "imminent risk to the health and safety of immigrant detainees, as well as to the public at large, [as] a direct consequence of detaining populations in congregate settings." SER366-67.

Instead, ICE issued general recommendations to detention facilities across the country. ICE suggested that facilities *could* identify people with medical vulnerabilities who should be better protected or considered for release, and it offered general recommendations about containing the spread of the virus. But ICE did not *require* any preventive steps or responses to outbreaks, nor did it mandate other commonsense changes like halting the transfer of people between facilities. And it did not put in place systems to specifically protect those most vulnerable to the ravages of COVID-19 by providing

targeted clinical guidance, centralized monitoring and tracking, and oversight of detention facilities. ER10-11, 14. Even when ICE headquarters later announced stricter policies, the extensive on-the-ground evidence showed that those policies existed only on paper, were not enforced by ICE leadership, and were not serving to keep the most vulnerable people in detention safe.

ICE's passive response to the pandemic was reckless. As the district court found, ICE's approach subjected those with medical vulnerabilities to a substantial risk of serious harm, likely in violation of the Fifth Amendment and the Rehabilitation Act. So the court granted a preliminary injunction, targeted at the nationwide directives coming from ICE headquarters, requiring ICE to finally set and enforce (1) policies to ensure that people with medical risk factors are identified, (2) standards to protect their safety while in detention, and (3) procedures for ICE to use in making individualized custody determinations based on individuals' risk factors. ER41-42.

ICE's brief mistakes this standards-focused preliminary injunction for an omnibus writ of habeas corpus. ICE builds its entire argument on the premise that, "although plaintiffs asked for

implementation of precautionary measures, release is in fact what they are ultimately demanding." OB30. It then argues from that assertion that class certification was improper and that the Fifth Amendment and the public interest do not require release. But the preliminary injunction does not order release. ER41-42. It requires that ICE headquarters set systemwide standards and policies—like the ones ICE itself says it created, but had not actually implemented or enforced—so that ICE officers and local detention facilities could *in turn* use those standards to make appropriate, medically sound decisions in individual cases. Because there is only one ICE headquarters, an order requiring implementation of systemwide standards necessarily affords class-wide relief, making this case a paradigmatic example of a Rule 23(b)(2) class.

ICE also says preliminary relief was unnecessary given its "evolving response to an evolving pandemic." OB43. But that just highlights the fundamental oddity of this appeal. The injunction was never stayed, ICE never moved to modify or vacate it, and litigation has blazed ahead in the district court in the four months since. So, while the record in this appeal is frozen as of the district court's April 20 ruling, the real-world circumstances have indeed evolved, both for

4

better and worse, under the injunction. If ever there was a time to take seriously this Court's admonition that only "a limited form of review" is appropriate in fluid circumstances like these, this is it. *Melendres v. Arpaio*, 695 F.3d 990, 996 (9th Cir. 2012); *see Zepeda v. INS*, 753 F.2d 719, 723-24 (9th Cir. 1983).

Because the district court did not abuse its discretion when it issued the preliminary injunction, this Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 & 1343.

This Court's jurisdiction is disputed in part. Although 28 U.S.C. § 1292(a)(1) allows for review of the district court's preliminary injunction order, this Court lacks jurisdiction over ICE's interlocutory appeal of the provisional class certification order. *See infra* at 56-61.

## STATEMENT OF THE CASE

### *The COVID-19 Pandemic*

The COVID-19 pandemic is a nationwide public health crisis. The SARS-CoV-2 virus that causes the disease spreads easily between people "at close quarters of 3-6 feet" through contact or respiratory droplets produced when an infected person coughs, sneezes, talks, or breathes. ER8; *see also* SER335-36. And "[b]ecause people may be

infected but asymptomatic, they may unwittingly infect others." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring); *see* SER323.

"[I]ndividuals with underlying health conditions like heart, lung, or liver disease, diabetes, or old age" are at an especially high risk of death—"about 15%"—if they contract COVID-19. ER8 (citing SER318-19, 336). Even those who survive may face serious injury, such as "permanent loss of respiratory capacity, heart conditions, kidney damage, and other complications." ER8 (citing SER321-22).

### *COVID-19 Among Detained Populations*

To prevent the spread of the virus, public health experts—including the CDC—uniformly recommend "social distancing." SER200. But "social distancing … is often impossible in 'congregate settings,'" like prisons and other detention facilities, where people must engage in basic activities in shared, crowded spaces. ER8. Consequently, "[t]he risk[] of" COVID-19 spreading "in prisons and jails [is] significantly higher than outside." ER8.

That is especially so in the facilities where the government detains noncitizens while they are in civil removal proceedings. *See* 8

U.S.C. § 1226.  In immigration detention, social distancing is "an oxymoron."  SER367; *see, e.g.*, SER58 (70 people eat all meals together in a "very crowded" space); SER79-80 ("90 people … spend[] most of the day in a single common area.").  Housing areas in particular are "densely packed," SER508, with people sharing cells that are neither "wider [n]or longer than six feet," SER58-59.  Worse still, other safety precautions that might limit the spread even in close quarters, like frequent handwashing and mask-wearing, have not been taken because soap and personal protective equipment (PPE) are often in limited supply in ICE detention facilities.  *See, e.g.*, SER59, 66, 81.

The combined effect of all this is that, once COVID-19 enters a facility, "ICE will be unable to stop the spread of the virus throughout the facility."  SER507; *see* SER332-35, 366-69.  Sure enough, "infection rates [have] grow[n] exponentially" in immigration detention.  ER8. The number of confirmed COVID-19 cases in ICE detention grew from 6 while preliminary injunction briefing was underway in March and April, to 124 at the time of the preliminary injunction order in late

April, ER9, to 4,568 reported by ICE as of the filing of this brief.[1]

Today, over 20% of the individuals tested by ICE have tested positive,[2] a rate more than double that of the general population.[3]

***ICE's COVID-19 Response***

Relevant here, ICE headquarters issued four guidance documents to detention facilities around the country during the first two months of the pandemic.

**March 6 Guidance.** ICE issued "interim guidance" on COVID-19 on March 6. ER9; SER381-90. That protocol was silent about "basic infection control measures," "surge capacity needs," testing protocols, or "identification of high-risk patients." SER511-15.

---

[1] U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19: ICE Detainee Statistics*, https://www.ice.gov/coronavirus#tab2 (last updated August 14, 2020).

[2] *Id.*

[3] *See* CDC, *Cases, Data, and Surveillance*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html.

This Court "may properly take judicial notice of [agency] data, as such data 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *United States v. Dreyer*, 767 F.3d 826, 834 n.12 (9th Cir. 2014) (quoting Fed. R. Evid. 201(b)(2)).

**March 27 Action Plan.**  After the CDC issued interim guidance to all correctional and detention facilities on March 23, *see* ER9-10; SER197-222, ICE released an updated "Action Plan" on March 27. ER10-11; SER297-302.  The Action Plan incorporated some of the CDC's recommendations, but not its guidelines regarding screening and monitoring for symptoms, social distancing and other preventative measures, or protocols for minimizing the threat to high-risk individuals.  SER277-83.  The Action Plan merely offered recommendations—and even then, only to ICE-dedicated facilities, not "intergovernmental partners and non-dedicated facilities."  SER297.

**Docket Review Guidance.**  On April 4, ICE released its "Docket Review Guidance," which purported to direct local Field Office Directors to identify individuals in certain high-risk categories, and then to make individualized determinations regarding continued custody.  ER11; SER223-25.

**Pandemic Response Requirements.**  On April 10, ICE issued "Pandemic Response Requirements" (PRR) that set forth purportedly "mandatory requirements" for all immigration detention facilities. ER11-12, 55-72.  The PRR adopted a narrower definition than the CDC

of who qualifies as "high risk," and it did not instruct on how to protect high-risk individuals in custody.  SER46-47.

ICE had no mechanisms in place to implement or enforce compliance with any of these policies.  Rather, "both before and during the COVID-19 pandemic," ICE "d[id] not have a centralized screening, let alone tracking, mechanism or procedure to identify medically vulnerable or disabled individuals in its custody."  ER15-16; *see* SER52-55.  And ICE admitted at the preliminary injunction hearing that it "can't control how [the PRR will] be implemented" at individual facilities.  SER167.

Even after the PRR, detention facilities have failed to: provide detainees with information on the symptoms of COVID-19, or how to respond to those symptoms, SER58, 80, 106, 111; limit transfers of detained persons, SER59, 79-80, 111-12, 117-18; promote social distancing among staff or detainees, SER58-59, 67, 71, 77-78, 94-97, 105-07, 111, 117-18; provide access to personal protective equipment, soap, hand sanitizer, and cleaning products, SER59, 71-72, 78, 81, 86-87, 94-97, 100-01, 106, 111-12, 117-18; or carry out additional sanitizing procedures, SER59, 65-66, 71, 80, 94-97, 101.

***Plaintiffs' August 2019 Lawsuit***

Plaintiffs are individuals in immigration detention who have serious health conditions, along with two organizations that provide social and legal services to them. SER121-25. In August 2019—months before the pandemic took root in the U.S.—Plaintiffs filed a class action complaint for injunctive and declaratory relief against ICE, DHS, and officers of those agencies (collectively, "ICE"). *See* SER120-21, 125. They claimed that ICE's healthcare system for people in immigration detention fails to satisfy the "minimum lawful conditions of confinement" mandated by the Fifth Amendment's Due Process Clause, imposes punitive conditions of confinement without due process, and fails to afford the accommodations required by § 504 of the Rehabilitation Act. ER5; SER121-25.

ICE moved to dismiss the complaint for failure to state a claim, but the district court denied that motion in a detailed order. SER120-42.

***The April 2020 Preliminary Injunction***

Although the complaint addressed general systemic failings in ICE's healthcare system, those harms escalated when COVID-19 hit

American soil.  The serious risk of illness and death to medically vulnerable people in immigration detention prompted Plaintiffs to move for a preliminary injunction and provisional class certification in March. ER6.

The district court granted both motions.  ER1-42.  First, the court provisionally certified two subclasses of people with a "heightened risk of severe illness and death upon contracting the COVID-19 virus." ER1-2.  The first subclass ("Risk Factors Subclass") includes those in immigration detention who have one or more risk factors, like being over the age of 55, being pregnant, or having chronic health conditions such as cardiovascular disease, diabetes, cancer, and HIV/AIDS.  ER1-2.

The second subclass ("Disability Subclass"), specific to Plaintiffs' Rehabilitation Act claims, includes all individuals held in ICE custody whose disabilities place them at higher risk for death or severe illness caused by COVID-19.  ER2.

The district court explained that provisional class certification is proper under Rule 23 because the thousands of people with risk factors in ICE custody make the classes numerous; the "systemwide" nature of Plaintiffs' objections to ICE's centralized policies gives rise to common

questions of law and fact; the putative class representatives have typical claims because all class members "face the same or similar harms arising from" ICE's same lack of adequate and enforceable standards; and the putative class representatives and class counsel can effectively represent the interests of the class as a whole. ER24-30. In addition, because the relief sought is systemic and not "individualized," the court held that "the same injunction or declaratory judgment would provide relief to all class members, or to none of them," thereby satisfying Rule 23(b)(2). ER30.

The court then found several "systemic deficiencies" in ICE's treatment of at-risk detainees, including a "lack of any requirement … that Field Offices make individualized custody determinations for at risk detainees"; an underinclusive list of risk factors; a "lack of a performance standard for the safe detention of at risk detainees"; and "inconsistent adherence" to ICE's own detention standards "pertinent to COVID-19." ER40.

The district court found that these deficiencies demonstrate that Plaintiffs are likely to succeed on each claim. ER30-39. The court also

found that "[t]he balance of equities and public interest sharply incline in Plaintiffs' favor." ER40.

To resolve those deficiencies, the court issued a limited preliminary injunction that requires ICE to:

- provide Field Office Directors a list of risk factors;

- identify and track all ICE detainees with risk factors;

- make timely custody determinations for detainees with risk factors, regardless of whether they have previously requested other relief;

- provide necessary training to any staff tasked with identifying detainees with risk factors, or delegate that task to trained medical personnel;

- promptly issue a performance standard or supplement to the PRR defining the minimum acceptable detention conditions for detainees with risk factors; and

- monitor and enforce facility-wide compliance with the PRR and performance standard.

ER41-42.

ICE appealed 60 days later, on the last day to file. ER51-52.

### *Ongoing Proceedings In The District Court*

Meanwhile, however, proceedings have continued in the district court, both in the underlying case and with respect to the COVID-19-specific preliminary injunction. *See, e.g.*, Dkt. No. 213 (summarizing

14

the current litigation plan).  Since the district court issued its

preliminary injunction, ICE has also twice updated its PRR.[4]  Because

those updates fail to resolve the inadequacies addressed by the

injunction, Plaintiffs have moved to enforce the preliminary injunction.

Dkt. No. 172.  That motion remains pending before the district court.

**SUMMARY OF ARGUMENT**

**I.**  The district court did not abuse its discretion in granting a

narrowly tailored preliminary injunction requiring ICE to implement

select policies to protect high-risk groups from COVID-19.

**A.**  Plaintiffs are likely to succeed on their deliberate indifference

claim.  The record evidence amply supports the district court's

conclusion that Plaintiffs face a substantial risk of serious harm

because of ICE's objectively unreasonable failures to mandate basic

measures that would protect medically vulnerable people in detention

---

[4] U.S. Immigration and Customs Enforcement, Enforcement and
Removal Operations, *COVID-19 Pandemic Response Requirements
version 2.0* (June 22, 2020),
https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsClean
Facilities-v2.pdf (Dkt. No. 173, Ex. 14); U.S. Immigration and Customs
Enforcement, Enforcement and Removal Operations, *COVID-19
Pandemic Response Requirements version 3.0* (July 28, 2020),
https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsClean
Facilities.pdf (Dkt. No. 218, Ex. 1).

from COVID-19.  *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018).  By not identifying those people with risk factors, providing clinical guidance specifically for them, or prioritizing them for release, ICE acted with reckless disregard for their health.

**B.**  Plaintiffs are also likely to succeed on their punitive conditions claim.  Because Plaintiffs are in civil detention, they cannot be subjected to conditions of confinement that amount to punishment.  *See Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004).  The district court correctly found that these conditions are punitive because ICE has failed to take even the protective actions that federal prisons have taken, and no legitimate immigration-enforcement purpose justifies holding people in circumstances this perilous.

**C.**  Plaintiffs are also likely to succeed on their claim under § 504 of the Rehabilitation Act.  Plaintiffs established that, based on their underlying health conditions, they qualify as persons with disabilities— a point ICE disputes here but forfeited before the district court.  The district court correctly found that, by failing to identify individuals with disabilities that make them especially vulnerable to COVID-19 and to provide them with minimally adequate protection, ICE has denied them

16

the accommodations that § 504 requires. *See Armstrong v. Brown*, 732 F.3d 955, 962 (9th Cir. 2013).

**D.** The district court did not abuse its discretion in finding that the other preliminary injunction factors also strongly favor Plaintiffs. Plaintiffs are likely to suffer grave and irreparable harm absent a preliminary injunction. And the balance of equities and public interest weigh heavily in favor of Plaintiffs, given the extreme risks of illness and death that they face during the pandemic. *See Padilla v. ICE*, 953 F.3d 1134, 1147-48 (9th Cir. 2020).

**II.** The Court should also reject ICE's challenge to the class certification order.

**A.** This Court lacks jurisdiction over the interlocutory class certification order because ICE neither sought nor received permission to appeal that order under Federal Rule of Civil Procedure 23(f). *See Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1709 (2017). Moreover, even under pre-*Microsoft* caselaw allowing "pendent appellate jurisdiction" over "inextricably intertwined" orders, the class certification order would not qualify because effective review of the preliminary injunction

17

order does not require review of it. *See Pashby v. Delia*, 709 F.3d 307, 318-19 (4th Cir. 2013).

**B.** The district court did not abuse its discretion in certifying the subclasses in any event. Plaintiffs challenge the adequacy of the nationwide measures ICE has taken (or failed to take) in response to COVID-19. They seek systemwide relief to ensure that ICE headquarters is equipping local detention facilities with the necessary tools to adequately mitigate the risk of infection to medically vulnerable groups. This Court has routinely recognized and approved similar class actions seeking systemwide, process-based relief. *See, e.g.*, *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014).

## STANDARD OF REVIEW

This Court "review[s] a district court's decision to grant … a preliminary injunction for abuse of discretion." *Saravia v. Sessions*, 905 F.3d 1137, 1141-42 (9th Cir. 2018) (affirming a preliminary injunction). "Abuse-of-discretion review is highly deferential to the district court." *Id.* This Court "do[es] not 'determine the ultimate merits,' but rather 'determine[s] only whether the district court correctly distilled the

applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand.'" *Id.*; *see also Padilla*, 953 F.3d at 1141.

The Court reviews "the district court's legal conclusions de novo, [and] the factual findings underlying its decision for clear error." *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 969 (9th Cir. 2015) (citation omitted). "Review of factual findings at the preliminary injunction stage is … restricted to the limited … record available to the district court when it granted or denied the injunction motion." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1235 (9th Cir. 1999) (affirming a preliminary injunction).

A district court's class certification order is also reviewed for abuse of discretion. *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1033 (9th Cir. 2020) (affirming class certification).

## ARGUMENT

**I.   The District Court Did Not Abuse Its Discretion In Granting A Narrowly Tailored Preliminary Injunction To Protect Plaintiffs From COVID-19.**

A preliminary injunction is appropriate where a plaintiff demonstrates "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The district court did not abuse its discretion in finding that standard satisfied here. Plaintiffs showed a likelihood of success as to two Due Process claims and one Rehabilitation Act claim, and any one of those three claims sufficed to warrant relief. *Infra* § I.A-C. At a minimum, Plaintiffs have raised "serious questions going to the merits." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). That is enough because the "balance of hardships … tips sharply towards" Plaintiffs, and they have shown "a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135; *infra* § I.D.

## A. Plaintiffs are likely to succeed on the merits of their deliberate indifference claim.

"[W]hen the [government] takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). And so, when the government allows for "systemwide deficiencies in the provision of medical … care that, taken

20

as a whole, subject sick … [people in custody] to 'substantial risk of serious harm,'" it violates their constitutional rights. *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011).

Specifically, a plaintiff shows unconstitutionally "inadequate provision of medical … health care," *id.* at 502, in violation of the Due Process Clause, when "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries," *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

The district court correctly "identified [this] legal rule," and its "application of the correct legal standard was [not] (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record,'" so there was no abuse of discretion.

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011); *see* ER31-32.  Rather, the facts in the record amply support the court's determination that ICE's objectively unreasonable response to COVID-19 poses a substantial risk of serious harm to Plaintiffs.

### 1. ICE does not dispute that Plaintiffs face a substantial risk of serious harm because of its decisions.

ICE does not dispute the district court's findings on three of the four *Gordon* elements, so we summarize them only briefly.

***Intentionality.***  The district court correctly found that ICE "made an intentional decision to promulgate only non-binding guidance for the first month of the pandemic," and to instead issue "policy documents" to detention facilities that "equivocated dangerously."  ER32; *see* ER9-11, 13-14 (summarizing the March-April 2020 response; citing SER197-222, 223-25, 297-302, 511-14).  ICE also decided not "to enforce compliance with its policy documents" or to redress any of the "monitoring and oversight failures" that ICE's inspector general had recently reported.  ER33.  ICE likewise declined to "track medically vulnerable and/or disabled detainees with specificity," thus preventing it from identifying or accommodating those at higher risk.  ER32.

ICE argues the *reasonableness* of these choices, OB36-37—a point we respond to below (at 24-38)—but it does not disagree that they were its *choices*.

***Substantial risk of harm.*** Both here and in the district court, ICE "do[es] not dispute that 15% of individuals in the Subclasses who ultimately contract COVID-19 will die, or that those who survive are likely to suffer life-altering complications," including permanent organ damage. ER33; *see also* SER364-70, 392-459, 519-20. That is a substantial risk of harm by any measure.

Moreover, the court found a substantial risk of outbreaks in ICE detention facilities given the lack of social distancing or other preventive measures to stop the uncontrolled spread of the disease. ER8-9; *see* SER332-35. Thus, "as recent ICE COVID-19 case numbers indicate, once a facility has a few cases, the disease spreads rapidly." ER33.

***Causation.*** ICE does not dispute that *if* its "action, or inaction," was unreasonable, then it caused these substantial risks of serious harm from COVID-19: ICE both has and exercises the authority to issue nationwide directives and protocols, and "[a]cross facilities, it is

23

ICE—not the facility—that decides whether an individual may be released." ER36.

### 2. Extensive evidence supports the district court's finding that ICE's COVID-19 response was objectively unreasonable.

ICE's quarrel is instead with the district court's findings under *Gordon*'s third element: that ICE's "failures to act are likely 'akin to reckless disregard'" because the steps it did take were "objectively unreasonable." ER34-35 (quoting *Gordon*, 888 F.3d at 1125); *see also Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013). This standard for deliberate indifference claims under the Due Process Clause, which applies to people held in pretrial detention, is less stringent than the equivalent Eighth Amendment standard applicable to prisoners convicted of crimes, given the different "language of the … Clauses" and "nature of the claims." *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015); *see Gordon*, 888 F.3d at 1122-25.[5]

---

[5] ICE's reliance on out-of-circuit cases applying the version of the deliberate indifference test under the Eighth Amendment—which requires a showing of *subjective* deliberate indifference—is therefore misplaced. *See Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020) (prison); *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020) (prison); *Swain v. Junior*, 961 F.3d 1276, 1285-86 (11th Cir. 2020) (pretrial

The district court explained in detail how ICE had failed to take the minimum steps necessary to mitigate the risk posed by COVID-19. Each of the court's findings was well-supported by hundreds of pages of testimony from medical experts (largely unrefuted), the class representatives, and other percipient witnesses, as well as ICE's own documents. And the court was unpersuaded by ICE's contrary evidence—two declarations from ICE officials, Drs. Rivera and Moon, neither of whom grappled with how their second-hand optimistic assumptions conflicted with Plaintiffs' on-the-ground, first-hand observations.

On appeal, ICE cannot escape the district court's findings of fact and this Court's settled law on what amounts to "objectively unreasonable" conduct.

***Failure to identify people with risk factors.*** First, the court found that ICE "fail[ed] to quickly identify individuals most at risk of COVID-19 complications and to require specific protections for those

---

detention, but applying the standard for prisoners per Eleventh Circuit law). The district court found that the subjective element could be satisfied here anyway. ER35 n.30.

individuals." ER34. And ICE cannot protect those at high risk if it does not know who to protect.

ICE's self-imposed blindness started with its early guidance, which "d[id] not propose identification of individuals with high risk of illness and death from COVID-19," let alone "what precautions should be taken to protect people with risk factors." ER14-15; *see* SER277-88, 511-15. And ICE's most recent guidance at the time of the preliminary injunction, the PRR, failed to remedy these initial flaws. The PRR created a slow and error-prone reporting system that requires facilities to send one-by-one emails to ICE headquarters for every high-risk individual they identify, without mechanisms for ICE to track and manage its high-risk population. SER46-49. The PRR also failed to create monitoring or surveillance protocols for facilities to follow, or any process for ICE headquarters to push information down to facilities in response to new information. SER47-49, 52-55. And the ICE officers charged with conducting individual reviews lack "medical training and might not ask questions" that would identify medical vulnerabilities. ER15; *see* SER239-40, 247.

Operating in the dark like that was unreasonable because "centralized surveillance is absolutely necessary in COVID response" at a systemwide level. SER287. The only way to optimize the distribution of crucial-yet-scarce resources—like tests and ventilators—is to know where the greatest need is. So ICE's failure to ensure any "centralized screening, let alone tracking, mechanism or procedure to identify medically vulnerable or disabled individuals in its custody during the COVID-19 pandemic," is classic, head-in-the-sand deliberate indifference. ER16.

***Failure to mandate measures to protect vulnerable people from COVID-19.*** Second, from the beginning of the pandemic, ICE failed to "provide[] even *nonbinding* guidance to detention facilities specifically regarding [protecting] medically vulnerable detainees." ER34 (emphasis added). That left facilities to develop a patchwork set of precautions without the benefit of expert clinical guidance for people with high-risk conditions—a "core aspect of outbreak management." SER285. ICE's laissez-faire approach to the dangers at its gates was so "substantial [a] departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible

27

actually did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982).

ICE insists that its early guidance was an "extensive, plainly reasonable" "careful, expeditious, and thorough response" to the outbreak. OB16, 33. But adjectives cannot overcome the weight of contrary evidence Plaintiffs presented and the district court accepted, and which Court reviews only for clear error. *K.W.*, 789 F.3d at 969.

The district court recognized that ICE "took some available measures to mitigate the threat of COVID-19," ER34, by issuing generally applicable, non-binding guidance in the early months of the pandemic and then with the PRR in April 2020. ER36; *see* ER9-12. But it found ICE's response objectively unreasonable both because of ICE's "months-long failure" to adopt more-concrete steps to protect vulnerable people, and because the evidence showed that ICE's purely hortatory guidance had not actually changed anything on the ground. ER36. The district court was "particularly disturbed that," even when ICE later updated its guidance, it "did not more strongly recommend social distancing or even PPE for the most at risk detainees stuck in cohorts." ER35; *see* SER277-83.

Indeed, ICE's assertion that it took steps as early as January 2020 to protect *its own* "workforce," ER73-74, only underscores its failure to have a plan in place to protect *medically vulnerable individuals* in its care by the start of the pandemic in March. This was not an unknown risk; ICE recognized it and deliberately disregarded it. ICE's decision to "ignore a condition of confinement that is sure or very likely to cause serious illness"—like "exposure … to a serious, communicable disease"—is a classic example of deliberate indifference. *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

ICE argues that whatever problems existed with its early guidance, its PRR "preclude[s] any finding" of deliberate indifference because it imposed "nationwide standards … on all ICE dedicated facilities, which ICE developed by relying on CDC guidance." OB35. ICE points specifically to the PRR's calls for greater social distancing and its direction to finally start identifying people in high-risk groups. OB34-35, 37-38. But the PRR—issued on the eve of the preliminary injunction hearing in this case—did not establish protocols that directed facilities to take *any* protective measures particular to those high-risk individuals (such as increased medical monitoring or care planning),

which is precisely what the district court ordered.  That failure to require precautions specific to the most vulnerable people in its custody is no "fine-point disagreement[] with ICE's response," OB39; the case fatality rate for the highest risk populations (15%)—those above 55 or with underlying medical conditions—is dramatically higher than it is for younger, healthier individuals (<1%).  SER319-21.

ICE says "substantive due process does not require ICE to mirror CDC guidance in all regards."  OB37.  We agree that guidance from a sister federal agency, which reports to the same President, is not a constitutional floor *or* ceiling.  But the district court did not hold otherwise.  It cited three specific CDC recommendations—on risk factors, social distancing, and PPE—that it was "particularly disturbed" ICE did not follow.  ER35.  Those omissions—along with "several additional global failures" in ICE's policies—made for a likely due process violation because they amount to unreasonably inadequate precautions *as established by the expert evidence* Plaintiffs presented, not because mirroring CDC guidance is a constitutional touchstone. ER35; *see* ER14-15.

And that evidence was overwhelming. Plaintiffs' expert Dr. Venters—a nationally recognized authority on healthcare in detention settings, SER504-06—described the minimum clinical guidance that ICE should have required its facilities to follow. This includes identifying high-risk people through robust screening processes, *see supra* at 25-27, cohorting them together, performing daily temperature and symptom checks, and requiring staff to take additional precautions in interacting with them. *See* ER14-15 (citing SER511-16); *see also* SER47, 278. Dr. Venters further criticized the PRR for failing to provide any guidance on "key aspects" of social distancing, SER49, or minimum standards for PPE and cleaning, SER50-51; *see also* SER47-49, 283-88.

These failures to establish specific protocols for medically vulnerable people were compounded by ICE's failure to monitor and enforce compliance with the guidelines ICE did promulgate. Named plaintiffs and other witnesses provided first-hand testimony from ICE facilities that:

- Social distancing was not occurring in crowded facilities;[6]

- Basic monitoring measures were not being instituted;[7]

- PPE use and availability was sporadic;[8]

- Soap, hand sanitizer, and cleaning products were not readily available;[9]

- Sick individuals were not being properly isolated despite requests from others;[10]

- Parole applications were denied or held up for vulnerable individuals;[11] and

- COVID-19 cases were reported at multiple facilities.[12]

ICE cannot show that these findings were clear error by simply pointing to policies that the court found existed only on paper.

---

[6] ER16-23 (citing ER101, 118, 126; SER463, 466-67, 476, 481, 501, 542, 545).

[7] *Id.* (citing ER101, 109, 118, 133-34; SER463, 481-82, 484, 500, 540).

[8] *Id.* (citing ER101, 126, 133; SER467, 474, 480-82, 484, 490, 500, 541-43).

[9] *Id.* (citing ER118; SER467, 474, 481, 484, 490, 496, 543).

[10] *Id.* (citing ER133-34; SER482-84, 545).

[11] *Id.* (citing SER475-77, 482-83).

[12] ER18-22 (citing *ICE Guidance on Covid-19*, https://www.ice.gov/coronavirus).

Indeed, notwithstanding ICE's unsupported assertion that its late-breaking PRR fixed everything, ICE did not implement any monitoring, surveillance, or enforcement mechanisms by which ICE headquarters would ensure that detention facilities were implementing its guidance, or would otherwise avoid "ICE's monitoring and oversight failures" of the past. ER33; SER52-55.[13]

The court was within its discretion to conclude—based on ICE's long pattern of abdicating its duty to monitor and oversee detention facilities, its "halting start to pandemic response," and its toothless policies thus far—that ICE had failed to "show[] that delays or non-enforcement of ICE facility-wide policies will cease." ER41; *see also* SER518-19 (Dr. Venters concluding, "ICE is not following even the most basic infection control policies that they report as their standard of care").

As for social distancing, ICE invokes the PRR to argue that the district court was "simply wrong" to find no increase in distancing.

---

[13] As Plaintiffs detailed in their post-hearing briefing, an organization with witnesses in eight different detention centers described "no material changes in protocols or procedures following the [PRR]," SER112, and repeated violations of its directives, SER56-119.

OB37.  But again, ICE's myopic focus on the written words of the PRR

ignores the unrebutted evidence that the district court relied on:

Plaintiffs' first-hand evidence showing that proper social distancing was

*not* actually occurring because ICE was not enforcing its policies.  *Supra*

at 31-32 & n.6.  For example, as the district court found, the many

facilities run by private contractors had an "economic imperative" to

keep beds full unless ICE headquarters enforced any mandates to

reduce density.  ER36 n.32.

Most fundamentally, though, this Court has repeatedly rejected

the notion that taking *some* remedial action—even "extensive" action—

necessarily "immunize[s] officials" or renders the government's response

constitutionally sufficient.  *Edmo v. Corizon, Inc.*, 935 F.3d 757, 793-94

(9th Cir. 2019).  The PRR did not obviate the need for preliminary

injunctive relief.[14]  ER41.  And to the extent any changes *since* the

---

[14] While proceedings in the district court since the preliminary injunction issued are beyond the scope of this appeal, they have only confirmed the inadequacy of the PRR.  The district court later expressed "concern[] that Defendants continue to slow walk their systemwide pandemic response," even under the PRR and the preliminary injunction, and observed that ICE's "cavalier approach to the Preliminary Injunction is disturbing." *Fraihat v. U.S. Immigration & Customs Enf't*, 2020 WL 2758553, at *4 (C.D. Cal. May 15, 2020).

preliminary injunction have improved ICE's response, the district court made clear that "[t]he parties may apply to modify or terminate the injunction." ER42. But post-injunction developments cannot themselves supply a ground for reversing the injunction. *See SEC v. Coldicutt*, 258 F.3d 939, 943 (9th Cir. 2001).

***Failure to prioritize medically vulnerable people for release.*** Third, the court found objectively unreasonable ICE's refusal to direct facilities to have "medical professionals," not ICE officers, "identify[] individuals at risk" for consideration of release "within a specific period of time" under standardized "clinical guidance"; and then to approach each custody determination with "a strong presumption of release" for those individuals, in order to reduce population density by taking the most at-risk people out. ER35.

ICE's "Docket Review Guidance" for release is wholly insufficient: It is "mere guidance and is not determinative"; it "omits [people with high body mass index] from the categories of person who will receive individualized consideration," even though the CDC defines them as a high-risk group; and it does not apply *at all* "to medically vulnerable individuals held in 'mandatory' detention," even though they too have a

35

due process right to safety in detention, and even though ICE has, in the past, released "[e]ven individuals required to be detained by statute" for medical and humanitarian reasons.  ER13, 35 & n.29; *see* SER305-06, 340-41.

ICE responds that, "as of April 10, ICE had already released nearly 700 medically vulnerable detainees."  OB39.  But ICE's director promptly announced that that was it:  He told Congress that "'our review of our existing population has been completed' and that ICE does not plan to release any other detainees to slow the spread of coronavirus in detention facilities."  SER7.  So the court ordered ICE to have trained staff "make timely custody determinations for detainees with Risk Factors."  ER41.

***Balancing the constraints on ICE.***  Finally, ICE defends the reasonableness of its response by pointing to "the evolving nature of the COVID-19 pandemic and the fact that ICE must balance" its "important public responsibilities … with real-world constraints involving limited resources."  OB35 (citing *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991)); *see* OB36-37.

Even assuming *Wilson*'s Eighth Amendment standard applies to due process claims by people who are held in civil immigration detention, *but see supra* at 24 n.5, that argument fails because the district court *did* take account of the constraints ICE faces when it "order[ed] relief narrowly tailored to resolve [the specific] deficiencies" it identified. ER40. The district court did not require ICE to stop enforcing immigration laws or direct it to release anyone. Rather, it ordered ICE to actually put into practice the same types of tools it said it already had available and was touting, but in a way that could be informed (e.g., by identifying and tracking those with risk factors), mandatory (e.g., by making them binding), and enforced (e.g., by monitoring and providing necessary training). ER41-42. Notwithstanding the "evolving" nature of the pandemic, the district court simply required ICE to take steps that were known at that time to be necessary yet were not being implemented.

That relief is far less intrusive than what the Supreme Court affirmed in *Plata* to remedy "systemwide" constitutional violations arising from prison overcrowding: an order to either build more prisons or release prisoners. 563 U.S. at 505 n.3, 538. *Plata* teaches that

government officials cannot rely on talismanic invocations of mission and state interests to excuse a deliberate failure to provide adequate care to vulnerable people in their custody, however legitimate that custody is. Rather, "[c]ourts … must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners." *Id.* at 511 (internal quotation marks omitted).

### B. Plaintiffs are likely to succeed on the merits of their punitive conditions claim.

The district court also correctly held that Plaintiffs are likely to succeed on the merits of their Fifth Amendment punitive conditions claim. ER36-37.

**1.** The government violates a person's due process rights by detaining her in conditions that "amount to punishment" if she has not been convicted of a crime. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). This Court has held that a particular condition will be deemed "'punitive' where it is intended to punish, *or* where it is excessive in relation to its non-punitive purpose, *or* is employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004) (cleaned up) (emphasis added).

Conditions must be even "'more considerate'" for those in *civil* detention: "[A] presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held." *Id.* Once a plaintiff establishes that presumption, "the burden shifts to the defendant to show (1) legitimate, non-punitive interests justifying the conditions of [the detained person's] confinement *and* (2) that the restrictions imposed … [are] not excessive in relation to these interests." *King v. Cnty. of Los Angeles*, 885 F.3d 548, 557 (9th Cir. 2018) (internal quotation marks omitted) (emphasis added).

*Jones* is binding Circuit precedent, which the district court built its analysis around. ER36-37. But ICE does not even cite it or acknowledge the presumption it imposes. The district court, however, correctly applied it. The court found that "it is likely punitive for a civil detention administrator to fail to mandate compliance with widely accepted hygiene, protective equipment, and distancing measures until the peak of the pandemic, and to fail to take similar systemwide actions as jails and prisons." ER37.

As evidence of ICE's unreasonable response, the court highlighted that "the protective actions taken by comparable prison and jail administrators have been as favorable or more favorable than Defendants'." ER37. Attorney General Barr, for example, had "command[ed] the Director of BOP [the Bureau of Prisons] to 'IMMEDIATELY MAXIMIZE' appropriate transfers to home confinement," to prioritize "'mov[ing] vulnerable inmates out of these institutions,'" and to avoid "inadvertently contribut[ing] to the spread of COVID-19 by transferring inmates" among facilities. ER37; SER270-72. By contrast, ICE's "Docket Review Guidance" merely asks local officers "to 'please' make individualized determinations as to release," and it does nothing to discourage rampant transfers that risk introducing the virus to new facilities. ER37; *see* ER126-27; SER224, 474.

**2.** ICE "only weakly argue[d] a legitimate, non-punitive justification" to overcome *Jones*'s presumption, but the district court was not persuaded. ER37. ICE posited, for example, that "immigration detention" legitimately serves "to secure attendance at hearings and to ensure the safety of the community." ER37. ICE reprises the argument

40

here.  OB40-41, 44.  But it is nonresponsive.  The question is not whether there is a non-punitive justification for immigration detention *in general*, but rather for *allowing these dangerous conditions* in detention.  Refusing to identify people in detention with risk factors, to require clinically sound protocols to ensure their safety, or to ensure that facilities comply with those procedures, does nothing to "secure attendance."

On the contrary, as the district court noted, "attendance at hearings cannot be secured reliably when the detainee has, is at risk of having, or is at risk of infecting court staff with a deadly infectious disease with no known cure."  ER37.  And exacerbating a pandemic— one that does not stop at the detention facility walls—endangers rather than protects "public safety."  ER37; *see* SER332, 506-07.

**3.** If ICE means to address only the possibility of using release as *one* tool to reduce population density and protect the medically vulnerable, then that is no basis to attack the many other parts of the injunction.  The argument fails even on those narrower terms anyway.

ICE raises the specter of releasing "dangerous criminal aliens," OB40, but again, BOP has taken robust measures to protect people

41

accused or convicted of serious crimes from COVID-19 through alternatives like "home confinement" and "electronic monitoring." ER37. The district court noted that "ICE could reduce the detained population by about half, simply by releasing detainees with no prior convictions and no pending charges." ER36 n.31.

ICE has not explained why its interest in public safety and securing attendance at court hearings is so much more important than BOP's. Nor has it put on any evidence to show why the alternatives to detention that BOP relies on would be ineffective here, even though ICE bore the burden in the district court to show inadequacy of "alternative and less harsh methods." *King*, 885 F.3d at 557-58. ICE points to differences in the statutes governing criminal imprisonment and immigration detention. OB43. But that does not answer the district court's finding that "[e]ven individuals required to be detained by statute can be and were released pursuant to ICE guidelines and policies, and statutory and regulatory provisions," nor the obvious point that "due process violations … could overcome a more generalized detention mandate." ER13 (citing SER305-08, 340-41, 482-83); ER29 n.22.

Indeed, even when there is *not* a global pandemic raging, ICE itself often relies on supervised release and electronic monitoring as alternatives to detention. *See* ER13 (citing SER546). Those tools yield a 99% attendance rate at court hearings. *See Hernandez v. Sessions*, 872 F.3d 976, 991 (9th Cir. 2017).

ICE also asks for deference to its "judgment calls," repeats its assertion that it has taken "extensive" measures to protect those in its custody, and assails the district court for "impos[ing] … 'a court's idea of how best to operate a detention facility.'" OB42 (quoting *Bell*, 441 U.S. at 539). But, under *Jones* and *King*, the district court was well within its discretion to look at the evidence of what ICE did, look at the evidence of what ICE *didn't* do, compare it to BOP, and find that ICE falls woefully short.

**4.** Even setting aside the comparison to BOP, confining vulnerable people in close quarters during a pandemic "is excessive in relation to [detention's] non-punitive purpose." *Jones*, 393 F.3d at 934. The district court found that ICE's failures to act mean that "any medically vulnerable individual in an ICE facility likely confronts an unreasonable risk of infection, severe illness, and death." ER34. Even

assuming detention makes it marginally more likely that noncitizens will appear for immigration hearings than electronic monitoring and supervised release do, that incremental benefit cannot justify the grave danger ICE has created in the current circumstances.

Because ICE's "objectives … could be accomplished in so many alternative and less harsh methods"—whether through more comprehensive precautions in detention or release—the district court did not abuse its discretion in concluding that continued detention without implementing and enforcing robust health protocols and social distancing is likely punitive. *Jones*, 393 F.3d at 934.

### C. Plaintiffs are likely to succeed on the merits of their Rehabilitation Act claim.

**1.** Finally, the district court correctly held that Plaintiffs are also likely to prevail on their claim under § 504 of the Rehabilitation Act. That claim requires a plaintiff to show that "(1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017). Plaintiffs established each element.

***Disability.*** First, the district court "f[ound] that the medical conditions defined in the [Disability Subclass] likely qualify under the Rehab Act." ER38. It accepted Plaintiffs' explanation "that persons with health conditions putting them at risk of severe illness or death if exposed to COVID-19 qualify as persons with disabilities." ER38. And it observed that ICE "d[id] not argue otherwise." ER38. As the district court recognized, ICE disputed only whether it was adequately *accommodating* Plaintiffs' disabilities. ER38; *see* SER291-92.

ICE now argues, however, that Plaintiffs do not have qualifying disabilities. OB45. But ICE "waived this argument by failing to raise it before the district court." *K.W.*, 789 F.3d at 974. Had ICE made the arguments below that it makes here—e.g., that Plaintiffs had not met "their burden of providing evidence that their alleged ailments constitute disabilities," OB46—then the district court could have weighed that contention, and Plaintiffs could have submitted additional evidence if needed. ICE should not be permitted to sandbag Plaintiffs by making this argument "for the first time on appeal." *K.W.*, 789 F.3d at 974.

In any event, ICE's argument is meritless. ICE argues that the applicable definition of "disability" from the Americans with Disabilities Act (ADA)—a "physical or mental impairment that substantially limits one or more of the major life activities," 42 U.S.C. § 12102(1)(A)—imposes a "'demanding standard' … that requires examining an individual plaintiff's condition and comparing it to a baseline of conduct that a non-disabled person would be able to perform." OB45 (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002)). But Congress later "reject[ed]" *Williams*'s holding "that the terms … under the ADA 'need to be interpreted strictly to create a *demanding standard* for qualifying as disabled,'" and amended the Act to clarify that establishing a disability "should *not* demand extensive analysis." ADA Amendments Act of 2008, Pub. L. No. 110-325, §§ 2(a)(4)-(6), (b)(4)-(5), 122 Stat. 3553 (emphasis added); *see, e.g.*, *Singh v. George Wash. Univ. Sch. of Med. & Health Scis.*, 667 F.3d 1, 4 (D.C. Cir. 2011).

Regardless, members of the Disability Subclass have qualifying disabilities because their existing conditions (e.g., heart and lung diseases) all "substantially limit[] one or more of the[ir] major life activities," including their ability to breathe, circulate their blood, and

46

fight off an infection like COVID-19 that targets their vital organs. *See* SER318-23, 333-34, 510-11 & nn.4-5.

***Benefit.*** The district court found that "[t]he programmatic 'benefit' in this context … is best understood as participation in the removal process"—safely. ER38. That was correct; a person cannot participate in challenging her removal from this country—by communicating with counsel, witnesses, or the immigration judge—if she is on a ventilator.

Moreover, "[b]ecause of the unique nature of correctional facilities, in which jail staff control nearly all aspects of inmates' daily lives, most everything provided to inmates is a public service," *Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 935-36 (N.D. Cal. 2015), including even "basic services, such as meals, mail, showers, and toilets," *Armstrong v. Brown*, 732 F.3d 955, 960 (9th Cir. 2013). Because of Plaintiffs' underlying conditions, a significant threat of COVID-19 (e.g., from "shared bathrooms and cell toilets without lids," ER9) limits their access to those activities.

***Denied by reason of disability.*** ICE additionally argues that Plaintiffs have not shown discriminatory treatment "solely by reason of

47

their disability." OB47. But ICE misunderstands the higher standard that applies in the detention context: Public entities that imprison or detain people have an *affirmative obligation* to identify and accommodate the needs of those with disabilities to ensure meaningful access to the entities' programs. *See* ER38; *Updike*, 870 F.3d at 949; *Armstrong*, 732 F.3d at 962 (affirming district court's order to track and accommodate class members' disabilities, and noting jails had an obligation to prevent future violations). And under that affirmative obligation, ICE's failure "to mandate identification of all detainees with CDC-defined COVID-19 vulnerabilities, and to provide them with minimally adequate protection," denies them the accommodations that § 504 requires. ER38; *see McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) ("facially neutral policies may violate the ADA when such policies unduly burden disabled persons").[15]

---

[15] Similarly, although the district court did not rely on this point, ICE also has an affirmative obligation to assess whether medical isolation is appropriate for disabled individuals, or whether less restrictive means, such as release, are more appropriate. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 607 (1999); 28 C.F.R. § 35.130(d); 6 C.F.R. § 15.30(d).

**2.** ICE also argues that the remedy the district court imposed for these likely violations is not a "'reasonable accommodation'" because it requires "'fundamental or substantial alteration to [their] programs.'" OB48 (quoting *Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir. 2010)).

ICE first contends that Plaintiffs have never identified "what specific COVID-19-related accommodation they needed, much less desired." OB48. That is a confusing objection. Plaintiffs have requested, and the district court ordered, that ICE do the *minimum* required to mitigate the risk of death or severe illness COVID-19 can cause for plaintiffs with disabilities: identify and monitor those people, require facilities to take appropriate steps to protect those people through social distancing and PPE, and oversee and enforce compliance with those mandates. The district court rightly rejected ICE's argument that each plaintiff is required to use individual submissions in "ICE request boxes to obtain this kind of systemwide response to a pandemic." ER38.

As for "fundamentally alter[ing] the removal process," OB48, ICE never attempted to make such a showing to the district court, as was its

burden.  *See Mark H.*, 620 F.3d at 1098.  So again, this argument cannot be raised for the first time on appeal.  *K.W.*, 789 F.3d at 974.  And it fails on the merits anyway.  The district court's order that ICE *consider* "alternative[s] to detention" to ensure social distancing could not fundamentally alter ICE's program.  ER38.  Nothing in the district court's order requires ICE to release individuals in its custody if it can find alternative ways to keep them safe in detention.  Nor does it require ICE to add extraordinary new tools to its toolbox.  The district court's order just requires it to actually pick up the tools it has and use them.

Next, ICE cursorily argues that "claims arising from allegedly inadequate medical *treatment* are not cognizable under the Rehabilitation Act."  OB48.  But Plaintiffs' COVID-19-related claims are not for inadequate *treatment* of their conditions; they are for failure to take steps to accommodate their *disabilities*, by protecting them from the especially high risk of death the virus poses to them.

Finally, ICE argues that because conditions vary across facilities and among putative class members, it cannot be the case that they have all been denied benefits on the basis of their disabilities.  OB49.  But

50

this simply misunderstands the remedy the district court awarded: not specific interventions for individuals, but rather fixes to the systemwide failures that have deprived *all* subclass members of the safety that comes from a clinically based and enforced set of policies and practices. ER38.

### D. The other preliminary injunction factors strongly favor Plaintiffs.

The district court did not abuse its discretion in finding that the other preliminary injunction factors "sharply incline" toward Plaintiffs either. ER40.

### 1. Plaintiffs are likely to suffer grave harm.

The "deprivation of constitutional rights 'unquestionably constitutes irreparable injury'" in itself. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Moreover, as the district court held, Plaintiffs also "established they will suffer the irreparable harm of increased likelihood of severe illness and death if a preliminary injunction is not entered." ER39. ICE "d[id] not deny that about 15% of individuals vulnerable to COVID-19 will die, if they are infected," nor that "more will suffer lasting

consequences." ER39. That is particularly so among "detained populations," who "tend to have worse health outcomes than the population as a whole." ER39 (citing SER318-19, 510-11). The court also found that the "number of immigration detainees testing positive for COVID-19 continues to increase at an alarming rate." ER39 (citing SER231-68).[16]

This Court has previously held that injunctive relief is proper in circumstances just like these, where individuals are threatened by "substandard physical conditions [and] low standards of medical care" in immigration detention. *Padilla v. ICE*, 953 F.3d 1134, 1147 (9th Cir. 2020) (internal quotation marks omitted). The district court did not err in following that reasoning here.

ICE's responses (OB51-52) border on the facetious. ICE says that Plaintiffs would suffer *more* harm under the preliminary injunction they requested because, if released from custody, they would lack access to the "publicly funded medical care" they receive while in custody.

---

[16] That is even more true today than it was in April: Over 4,500 people in immigration detention have now tested positive, and ICE reports positive cases at over 60% of the facilities in its network, with more and more falling ill every day. *Supra* at 8.

OB52.  Paternalism aside, that argument fails thrice over:  The inadequacy of that medical care is precisely what led the court to grant the injunction; ICE again mistakenly suggests that the preliminary injunction directs release; and the district court already accounted for the possibility that *some* people in detention might not prefer release when it directed ICE to "consider the willingness of detainees with Risk Factors to be released" when making "custody determinations."  ER41.

ICE also dismisses "plaintiffs' claims of future injury" as "hypothetical" and "speculative."  OB52.  But there is nothing speculative about detailed expert declarations documenting the specific risks arising from ICE's failures or the "exponential[]" spread of the virus in "ICE … detention facilities."  ER8-9; *see supra* at 7-8.  Nor is a harm "hypothetical" just because it has not yet reached the named plaintiffs; "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  *Helling*, 509 U.S. at 33.

Finally, ICE disputes that Plaintiffs face any risk because "the government has taken extensive measures to address the harms and

risks presented by COVID-19 and to address plaintiffs' concerns."

OB52.  But, as explained above (at § I.A.), the district court did not

clearly err in finding that those measures are inadequate and are *not*

protecting medically vulnerable people from COVID-19 infection on

ICE's watch.  *See* ER12; *see also* SER77 ("there have been no significant

or material changes" at individual facilities even "after the April 10,

2020 ICE guidelines"); SER65 ("conditions [are] get[ting] worse");

SER58, 106, 117.  And where an "injunction seeks to remedy the

government's actual practices, not just its policies on paper," the

"government's insistence that the existence of its forms and policies

alone obviates the need for the injunction misses the point."  *Orantes-*

*Hernandez v. Holder*, 321 F. App'x 625, 628 (9th Cir. 2009).

### 2.  The balance of hardships and public interest "sharply incline" in Plaintiffs' favor.

Nor did the district court abuse its discretion in finding that "[t]he

balance of equities and public interest sharply incline in Plaintiffs'

favor" given their "increased risks of severe illness and death."  ER40.

ICE asserts a countervailing interest "in the enforcement of

immigration laws," including immigration detention.  OB50.  But ICE

"cannot suffer harm from an injunction that merely ends an unlawful

practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). ICE also cites no evidence (and introduced none below) to substantiate its claim that the "injunction threatens to disrupt ICE's operations." OB50. Such "vague assertions" are "insufficient" to receive any weight. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018).

Likewise without merit (or evidence) is ICE's assertion that the injunction "intrudes into the day-to-day administration of detention facilities," and amounts to "micromanagement of ICE operations." OB50. The court ordered "narrowly tailored" relief that simply required ICE to actually start doing the things it said on paper it would do, in a consistent, actionable, and enforceable way. ER40; *see* ER41-42.

Indeed, ICE's contention that the injunction "will require substantial changes to ICE detention facility operations and intergovernmental service agreements with state and local governments" cannot be squared with its repeated argument on the merits that it has taken "many extensive measures … in compliance with CDC guidelines to protect detainees." OB42, 50. Either ICE is now making meaningful reforms (in which case the injunction does not "require substantial changes") or its existing policies are not being

enforced (in which case those changes are badly needed to protect people in detention and the surrounding community).

## II. The Court Should Reject ICE's Challenge To The Class Certification Order.

In addition to granting preliminary injunctive relief, the district court provisionally certified the Risk Factors and Disabilities Subclasses. ER1-2, 24-30. ICE challenges that order as well, but this Court lacks jurisdiction over that portion of ICE's appeal. *Infra* § II.A. If the Court nevertheless considers the question, it should find no abuse of discretion. *Infra* § II.B.

### A. The Court lacks jurisdiction over the interlocutory class certification order.

As a threshold matter, the provisional class certification order is not properly before the Court.

**1.** This Court's jurisdiction over interlocutory appeals is narrowly defined by 28 U.S.C. § 1292. Section 1292(e) provides that "[t]he Supreme Court may prescribe rules," under the Rules Enabling Act, "to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for under" § 1292. Federal Rule of Civil Procedure 23(f) is one such rule. It "authorizes 'permissive

interlocutory appeal' from adverse class-certification orders." *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1709 (2017). Thus, "[t]o take an immediate appeal from a federal district court's order granting or denying class certification, a party must first seek permission from the relevant court of appeals." *Nutraceutical Corp. v. Lambert*, 139 S. Ct. 710, 713 (2019).

ICE neither sought nor received permission to appeal the class certification order under Rule 23(f). And ICE may not belatedly seek permission now because Rule 23(f)'s "deadline is not subject to equitable tolling" and "courts are without authority to make exceptions" to it. *Nutraceutical*, 139 S. Ct. at 714-15. So the class certification portion of ICE's appeal should be dismissed.

**2.** ICE nevertheless asserts that this Court has jurisdiction over the class certification order because it is "inextricably bound up with the grant of the interim injunction." OB4. ICE cites *Paige v. California*, 102 F.3d 1035 (9th Cir. 1996), which recognized a form of "pendent appellate jurisdiction" over class certification orders that are "inextricably intertwined" with appealable interlocutory orders. *Id.* at 1039. ICE's contention fails for two reasons.

First, *Paige* is "clearly irreconcilable" with intervening Supreme Court authority. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). *Microsoft* observed that, in 1998, the Supreme Court exercised its statutory authority to adopt Rule 23(f) as the mechanism for interlocutory class certification appeals. 137 S. Ct. at 1709. And it held that Rule 23(f) thus left no room for an alternative approach this Court had adopted, under which parties could "bypass Rule 23(f)" by voluntarily dismissing their claims after an adverse class certification order and then appealing that "final" judgment. *Id.* at 1714; *see id.* at 1712-13.

*Paige* cannot survive *Microsoft*. It was decided both before Rule 23(f) was promulgated and before *Microsoft* clarified that, under § 1292(e), "appellate review of interlocutory orders not covered by statute" *must* "come from rulemaking"—like Rule 23(f)—"not judicial decisions in particular controversies or inventive litigation ploys." 137 S. Ct. at 1714.[17] Judicially created alternatives to Rule 23(f), like

---

[17] Decisions applying *Paige* after 1998 did not address Rule 23(f), and those cases predate *Microsoft* as well. *See, e.g.*, *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 984-85 (9th Cir. 2007) (en banc); *Meredith v. Oregon*, 321 F.3d 807, 814 (9th Cir. 2003).

*Microsoft*'s "voluntary-dismissal tactic" and *Paige*'s inextricably-intertwined doctrine, are invalid because they "subvert[] … the process Congress has established for … determining when nonfinal orders may be immediately appealed." *Id.* at 1712-13.  Under *Microsoft*, then, this Court may not "assume[] jurisdiction of [an] appeal challenging" an interlocutory class certification order absent "permission to appeal under Rule 23(f)." *Id.* at 1714.

Second, even if the "inextricably intertwined" theory remained valid, the class certification order here would not fit within it.  This Court "consistently interpreted 'inextricably intertwined' very narrowly," even in the doctrine's heyday.  *Cunningham v. Gates*, 229 F.3d 1271, 1284 (9th Cir. 2000).  "Two issues are not 'inextricably intertwined' if [the Court] must apply different legal standards to each issue." *Id.* at 1285.  Only if the Court "*must* decide the pendent issue in order to review the claims properly raised on interlocutory appeal," or "resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue," is "pendent appellate jurisdiction" proper.  *Id.* (emphasis added).

Here, effective review of the preliminary injunction does not require review of the class certification order.  The district court applied the standard for class certification (ER24-30) separately from the distinct standard for preliminary injunctive relief (ER30-41).  And although the court referred to the subclasses in its preliminary injunction analysis, its focus was on how ICE's *systemwide* policies and inaction in response to COVID-19 were constitutionally inadequate—an analysis that would have looked the same even if the court had deferred consideration of class certification until later in the litigation and instead considered only Plaintiffs' individual requests to enjoin those policies.  Indeed, this Court regularly reviews injunctions that have broad—even nationwide—effect, even when no question of class certification is presented.  *See, e.g.*, *Padilla*, 953 F.3d at 1142-52; *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020).

Thus, in virtually identical circumstances, the Fourth Circuit refused to consider a challenge to a class certification order when the defendant had not sought permission to appeal under Rule 23(f).  *See Pashby v. Delia*, 709 F.3d 307, 318-19 (4th Cir. 2013).  Even though the district court expressly "took the class members into account when

determining whether [the challenged policy] caused irreparable harm," class certification was not inextricably "intertwined" with the preliminary injunction because "the district court could have determined that [the policy] caused irreparable harm by looking only at its effect on the named Appellees." *Id.* at 318-19. There, as here, "because the class certification question is distinct from the preliminary injunction, the issue is not properly before [the court]." *Id.* at 319.

**B.      The district court did not abuse its discretion in provisionally certifying the subclasses.**

If the Court nevertheless reviews the class certification order, it should affirm.

ICE does not dispute that the Subclasses meet Rule 23(a)'s numerosity requirement. ER25-26. Nor does ICE challenge the district court's determination that injunctive relief was appropriate under Rule 23(b)(2) because "Defendants' actions and inactions apply to the class generally," and "the same injunction or declaratory judgment would provide relief to all class members, or to none of them." ER30. Indeed, "claims 'for injunctive relief stemming from allegedly unconstitutional conditions of confinement are the quintessential type of claims that

61

Rule 23(b)(2) was meant to address.'" *Parsons*, 754 F.3d at 687; *see*

*Rodriguez v. Hayes*, 591 F.3d 1105, 1125-26 (9th Cir. 2010).

Yet the same reason why certification under Rule 23(b)(2) was proper (as is undisputed here) is why ICE's challenges under Rule 23(a)'s commonality, typicality, and adequacy requirements all fail: "Plaintiffs do not seek any individualized determination by [the district court] of whether they are entitled to release, and do not request a different injunction for each class member. Rather, they ask the Court to determine whether ICE's systematic actions, or failures to act, in response to COVID-19 amount to violations of the class members' constitutional or statutory rights." ER30.[18]

Plaintiffs sought an order directing *ICE headquarters* to implement policies and systems to ensure that at-risk individuals would be identified, tracked, and kept safe from infection—through clinically sound practices in detention or through custody redeterminations as

---

[18] For this reason, even critics of so-called "nationwide injunctions" recognize that Rule 23(b)(2) class actions are often appropriate in precisely these circumstances. *See, e.g.*, Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 475-76 (2017); Michael T. Morley, *De Facto Class Actions?*, 39 Harv. J.L. & Pub. Pol'y 487, 540-44 (2016).

needed to reduce density. As ICE itself stresses (OB33-39), it issues

*nationwide* guidance and standards on those issues. So all class

members have in common the same fundamental claim—those

systemwide policies are inadequate—based on the same risk of injury.

Given Plaintiffs' challenge to systemwide practices and the specific form

of relief they requested, the district court was squarely within its

discretion to certify the subclasses here.

### 1. Plaintiffs established commonality.

Class certification is appropriate when "there are questions of law

or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs meet

this requirement when their claims "'depend upon a common

contention' such that 'determination of their truth or falsity will resolve

an issue that is central to the validity of each one of the claims in one

stroke.'" *Parsons*, 754 F.3d at 675 (quoting *Wal-Mart Stores, Inc. v.

Dukes*, 564 U.S. 338, 350 (2011)). Thus, "where the circumstances of

each particular class member vary but retain a common core of factual

or legal issues with the rest of the class, commonality exists." *Id.*

(cleaned up).

The district court correctly found that Plaintiffs satisfied this requirement. Plaintiffs challenge "[t]he existence, scope, and adequacy of" the "nationwide measures ICE has taken in response to COVID-19 to protect the health of vulnerable immigration detainees." ER26. The relief they seek is similarly "system-wide": "a global response" from ICE headquarters that includes policies, standards, training, and oversight to ensure that local detention facilities are adequately mitigating the risk of COVID-19 transmission to medically vulnerable groups. ER26-27, 41-42. By definition, ICE can have only one set of nationwide policies. So, whether or not Plaintiffs are correct that those nationwide policies (or lack thereof) violate due process or the Rehabilitation Act, "a class-wide proceeding" plainly has "the capacity … to generate common *answers* apt to drive the resolution of the litigation," one way or the other. *Wal-Mart*, 564 U.S. at 350.

ICE contends that the district court "fail[ed] to account for the individualized circumstances at over 250 facilities nationwide," such as class members' different health conditions and criminal histories, and different facilities' management and existing health protocols. OB19-21. But, as the district court found, that argument does not "defeat

64

commonality" because it misunderstands the relief that Plaintiffs seek: a systemic policy response from ICE headquarters prescribing consistent and adequate *process and standards* for local facilities to use in responding to the health risks that each class member faces.  ER27.

We do not disagree that the actions ICE *ultimately* takes with respect to any individual or detention facility (whether improved screening and sanitizing, social distancing, or release) may vary with individual and local circumstances.  And so "a single injunction" mandating specific individual outcomes that "some members of the certified class may not be entitled to" may well have been improper. *Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018).  But—contrary to ICE's repeated suggestion (OB19-23)—Plaintiffs did not seek "a single common remedy … for everyone in the proposed class" with respect to *particular on-the-ground interventions*, nor did the district court grant such relief.  OB22.

Rather, the single common remedy Plaintiffs seek is an injunction requiring *ICE headquarters* to provide facilities with medically sound protocols and tools to identify and protect those with heightened vulnerability, and to ensure compliance with those protocols through

close oversight.  That relief would ultimately enable local facilities to adequately protect class members in light of individual and geographic circumstances.  But the remedy that addresses the "unreasonable risk of harm" common to "the class as a whole" is the upstream act of reforming ICE's systemwide standards (which the preliminary injunction requires), not the downstream act of applying those standards to individual cases (which the injunction does not do).  ER28; *see supra* at 14, 36-38.  To take one concrete example, the injunction does not direct individual release determinations; it mandates a *process* for ICE to use in making custody redeterminations that properly account for medical conditions.  ER40-41.

ICE's own arguments on the merits show why this is a common issue.  In addressing Plaintiffs' Fifth Amendment claims, ICE recognizes that common, nationwide policies and standards are desirable and achievable; it just insists that it has already implemented them.  *See* OB34 (PRR was "designed to establish consistency across ICE detention facilities by establishing mandatory requirements and best practices in all detention facilities housing ICE detainees"); OB35 (describing "nationwide standards imposed by the PRR"); OB39

(discussing "ICE's evolving system-wide response to the COVID-19 pandemic"). The parties dispute whether those nationwide standards are adequate, but whoever is right, the "*answer*[]" to that question will be "common" to the whole class. *Wal-Mart*, 564 U.S. at 350.

This scenario is no different from others in which this Court has repeatedly found commonality "where [a] lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001). *Armstrong* rejected the argument that "wide variation in the nature of the particular class members' disabilities precludes a finding of commonality" in a discrimination suit brought by California prisoners with disabilities, *id.*—an argument virtually identical to the one ICE makes here. *See* OB19-20 (describing how "class members have diverse risk profiles" and different "underlying condition[s]"). This Court held instead that "individual factual differences among the individual litigants or groups of litigants [did] not preclude a finding of commonality" where the claim was that the State systemically failed to identify, track, and accommodate any disabilities in the first place. *Armstrong*, 275 F.3d at 859, 868.

The district court relied on the similar decision in *Parsons*, which approved a statewide class of 33,000 Arizona inmates who challenged deficiencies in the Arizona Department of Corrections' healthcare system, even though different class members had different conditions and risks. ER27 (citing *Parsons*, 754 F.3d at 681-82). ICE hazards no response to *Parsons*. Yet it too forecloses ICE's argument: "[A]lthough a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly *the same constitutional injury* when he is exposed to *a single statewide … policy or practice* that creates a substantial risk of serious harm." *Parsons*, 754 F.3d at 678 (emphasis added). The class thus shared common issues because addressing the plaintiffs' claims "d[id] not require [the Court] to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination." *Id*. Instead, "[t]he putative class and subclass members … set forth numerous common contentions" about the adequacy of the "statewide policies and practices," and the "truth or falsity" of those contentions

"can be determined in one stroke." *Id.* As ICE's own assertions about its nationwide policies demonstrate, the same is true here.

ICE also points to class members' "differing criminal histories that affect their potential for release." OB21-22. But that argument fails at two levels. First, as the district court explained, "[t]he class's interest is not in release, but in not being subjected to unlawful conditions of confinement." ER29 n.22. Plaintiffs have not urged indiscriminate class-wide release, nor does the preliminary injunction direct that.

Second, the question whether ICE is subjecting individuals to an *unconstitutional* risk of infection with a deadly disease does not turn on whether a *statute* provides for mandatory or discretionary detention. *See* ER29 n.22. If release proves to be the best way to reduce the risk of transmission in immigration detention, then ICE would be free to consider statutory mandates as one ground for prioritizing whom to release, but *all* class members would benefit in common from the reduced risk of infection that comes from less density. *See Rodriguez*, 591 F.3d at 1123 (despite differences in detention statutes, "the constitutional issue at the heart of each class member's claim for relief is common").

### 2. Plaintiffs demonstrated typicality.

The class representatives' claims must also be typical of the class. Fed. R. Civ. P. 23(a)(3). Like commonality, this typicality requirement is construed "permissive[ly]." *Rodriguez*, 591 F.3d at 1122, 1124 (citation omitted). And these two requirements "tend to merge." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 n.11 (9th Cir. 2016) (quoting *Wal-Mart*, 564 U.S. at 349 n.5). ICE acknowledges that its challenge to typicality is based on "similar reasons" as to commonality, and its contentions fail for similar reasons too. OB24.

The district court correctly "f[ound] that the putative class representatives' claims are typical of those in the proposed class, because they have the same claims and face the same or similar harms arising from the same course of conduct." ER27-28; *see Parsons*, 754 F.3d at 685. Each representative plaintiff has a risk factor or disability included in the class definitions. Each faces similar "exposure to an unreasonable risk of harm resulting from COVID-19 infection" while in detention because—as Plaintiffs' largely unrebutted expert testimony showed—"individuals with underlying health conditions like heart, lung, or liver disease, diabetes, or old age" all share a heightened risk of

70

"[s]erious illness and death."  ER8, 27-28; *see* SER318, 333-36, 510-11.

And each was confronted with that risk because of the same "course of

conduct"—ICE headquarters' "inadequate oversight of detention

facilities' medical care, failure to identify individuals with disabilities or

with COVID-19 vulnerabilities, and failure to implement adequate

precautionary measures and protocols."  ER27-28.

ICE argues that the class representatives' circumstances are not

typical because they are "too varied" and "require too many

individualized assessments," and because "the government's specific

practices and procedures vary by detention facility."  OB25-26.  This

just reflects the same misunderstanding of Plaintiffs' claims as in ICE's

commonality argument.  *See supra* at 63-69.  And it is equally

foreclosed by *Parsons*.  It is enough that each plaintiff "declares that he

or she is being exposed, like all other members of the putative class, to a

substantial risk of serious harm by the challenged [ICE] policies and

practices."  *Parsons*, 754 F.3d at 685; *see also Just Film, Inc. v. Buono*,

847 F.3d 1108, 1116 (9th Cir. 2017).

"The particular characteristics of the Petitioner or any individual

detainee will not impact the resolution of this general … question and,

therefore, cannot render Petitioner's claim atypical." *Rodriguez*, 591

F.3d at 1124. Besides, "Rule 23(a)(3) requires only that their claims be

'typical' of the class, not that they be identically positioned to each other

or to every class member," so it does not "matter that the named

plaintiffs may have in the past suffered varying injuries or that they

may currently have different health care needs." *Parsons*, 754 F.3d at

686.

ICE also observes (OB26) that three class representatives were

ordered released from ICE custody in individual court proceedings. But

the propriety of class certification is measured as of "the filing of the

complaint." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1092 (9th Cir.

2011); *see, e.g.*, *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1043 (S.D. Cal. 2020).

And there are two other individual class representatives in any event.

ICE notes that it is detaining them "at facilities where, at the time of

the preliminary injunction, few, if any, detained individuals had tested

positive for COVID-19." OB26. But, for the reasons already discussed,

*all* class members are endangered by ICE's failure to mandate "a

minimally adequate national rescue response."  ER27; *see supra* at 64-66.[19]

ICE further contends that "the difference in legal standards across the circuits where the detention facilities are located also bars typicality."  OB26.  But no case holds that.  ICE cites *Califano v. Yamasaki*, 442 U.S. 682 (1979), but that decision stands for the opposite proposition:  The Supreme Court *affirmed* the certification of a nationwide class *despite* the risk of "foreclosing adjudication by a number of different courts," and it held that "[t]he certification of a nationwide class, like most issues arising under Rule 23, is committed in the first instance to the discretion of the district court."  *Id.* at 702-03.  The district court here exercised sound discretion in concluding that "the representatives and the putative class members assert a similar risk of physical harm and of detriment to their rights," and share a "class interest in ensuring an appropriate systemwide response to COVID-19."  ER28.

---

[19] We note, in any event, that the judicially noticeable ICE data show that there are now 158 cases at the Stewart Detention Center, where class representative Aristoteles Sanchez Martinez is detained, SER70, and 21 cases at the Etowah County Detention Center, where class representative Alex Hernandez is detained, SER58.  *See supra* at 8 n.1.

Similarly, *Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987), did not address any question of typicality. Instead, it reaffirmed that "there is no bar against class-wide, and nationwide relief in federal district or circuit court when it is appropriate." *Id.* at 1170. This Court recently reaffirmed that point and found no abuse of discretion where "class-wide, nationwide relief [wa]s necessary to afford the class members the relief to which they are entitled." *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020).

ICE's argument makes no sense anyway. Suits challenging government programs may generally be brought in any district where a plaintiff resides, 28 U.S.C. § 1391(e)(1), even if they may lead to decrees or judgments with nationwide effect. And if the government wins under the law of some Circuits and loses under others', the Supreme Court stands ready to resolve the conflict, *see* S. Ct. R. 10(a), and the government may request a stay in the meantime, *see, e.g.*, *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020).

But none of this has anything to do with Rule 23(a)'s typicality inquiry: whether class members "have injuries similar to those of the named plaintiffs" that "result from the same, injurious course of

conduct." *Armstrong*, 275 F.3d at 869.  The district court did not abuse its discretion in finding that they do here.

### 3.    Plaintiffs are adequate class representatives.

Finally, the district court correctly determined that the class representatives and class counsel can adequately represent the class. The court found "no disqualifying conflict of interest or indication that Plaintiffs and their counsel will not 'vigorously' pursue the action on behalf of the class."  ER29 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).  And it recognized the named plaintiffs' "willingness to work with class counsel to effectively represent the interests of the class as a whole," as well as class counsel's "extensive experience litigating immigrants' rights and class actions."  ER29.

ICE nevertheless insists that the five named plaintiffs are inadequate class representatives because they have been detained in different facilities under different statutory provisions, and they represent only a few high-risk medical conditions.  OB28-29.  These arguments just retread ICE's challenges to "the other Rule 23(a) factors."  OB31.  They are no more persuasive the third time.  *See supra* at 64-66, 71-72.  And its "contention that an individual with diabetes

will advocate more or less vigorously to be protected from COVID-19 than an individual with cardiovascular disease or with HIV/AIDS" is just as meritless as its parallel attacks on commonality and typicality. ER29.

Ultimately, ICE does not identify any actual "conflicts of interest with other class members," and there are none. *Hanlon*, 150 F.3d at 1020. Plaintiffs have zealously advocated for the subclasses throughout—from the filing of their complaint pre-COVID-19, to their request for a preliminary injunction as the virus descended on ICE detention facilities this past spring, and in the ongoing district court proceedings in the many months since the April 20 preliminary injunction as the parties and the court have continued to address the evolution of the pandemic and ICE's responses.

# CONCLUSION

The district court's order granting a preliminary injunction should be affirmed, and the appeal of the class certification order should be dismissed.

August 14, 2020

Timothy P. Fox
Elizabeth Jordan
CIVIL RIGHTS EDUCATION AND
  ENFORCEMENT CENTER
1245 E. Colfax Avenue,
Suite 400
Denver, CO 80218

Jared Davidson
SOUTHERN POVERTY LAW
  CENTER
201 St. Charles Avenue,
Suite 2000
New Orleans, LA 70170

Stuart Seaborn
Melissa Riess
Rosa Lee Bichell
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, CA 94704

Respectfully submitted,

*s/Brian P. Goldman*
William F. Alderman
Brian P. Goldman
Mark Mermelstein
Jake Routhier
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Matthew R. Shahabian
Melanie R. Hallums
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Katherine M. Kopp
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005

Maria del Pilar Gonzalez Morales
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027

Shalini Goel Agarwal
SOUTHERN POVERTY LAW CENTER
106 East College Avenue,
Suite 1010
Tallahassee, FL 32301

Christina Brandt-Young
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017

Michael W. Johnson
Dania Bardavid
Jessica Blanton
Joseph Bretschneider
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019

Leigh Coutoumanos
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006

Veronica Salama
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, GA 30031

## STATEMENT OF RELATED CASES

Two cases pending before this Court also involve appeals by the government from preliminary injunctions concerning immigration detention and the COVID-19 pandemic:

- *Roman v. Wolf*, Nos. 20-55436 & 20-55662 (argument scheduled for September 15, 2020, San Francisco)

- *Zepeda Rivas v. Jennings*, No. 20-16276 (currently being briefed)

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 20-55634

I am the attorney or self-represented party.

**This brief contains 13989 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ *Brian P. Goldman*      **Date** August 14, 2020